*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CALVIN DEXTER STEWART,

        Defendant-Appellant.

UNPUBLISHED
July 27, 2026
10:36 AM

No. 367256
Kent Circuit Court
LC Nos. 21-001737-FH;
21-001740-FC

Before: N. P. HOOD, P.J., and BOONSTRA and FEENEY, JJ.

PER CURIAM.

Defendant appeals as of right his convictions arising out of two joined trial-court cases. In case number 21-001740-FC, defendant was convicted of: (1) first-degree murder, MCL 750.316; (2) felon in possession of a firearm (felon-in-possession), MCL 750.224f; and (3) possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. In case number 21-01737-FH, defendant was convicted of: (1) possession with intent to deliver less than 50 grams of cocaine, MCL 333.7401(2)(a)(*iv*); (2) carrying a concealed weapon, MCL 750.227; and (3) third-degree fleeing and eluding, MCL 750.479a(3). The trial court sentenced defendant, as a fourth-offense habitual offender, MCL 769.12, to serve the following sentences: (1) life without the possibility of parole for his first-degree murder conviction, (2) 25 to 100 years for his felon-in-possession conviction, (3) 2 years for his felony-firearm conviction, (4) 6 to 80 years for his possession-with-intent-to-deliver conviction, (5) $3^1/_2$ to 80 years for his carrying-a-concealed-weapon conviction, and (6) $3^1/_2$ to 80 years for his third-degree fleeing and eluding conviction.[1] We affirm.

## I. TRIAL FACTS

This case arises out of the death of the victim after he suffered nine gunshot wounds. On December 22, 2020, after 11:00 a.m. on Prospect Avenue in Grand Rapids, a witness heard

---

[1] Defendant's felony-firearm conviction was to be served first; thereafter, the rest of his sentences were to be served concurrently.

multiple gunshots and saw: (1) the victim run by; (2) a black SUV swerve and collide with the victim, knocking the victim over; (3) the gunman run up to the victim and shoot the victim twice with a semiautomatic pistol; (4) the gunman attempt to enter the SUV before returning to the victim and shooting him two more times; and (5) the gunman enter the SUV. The witness took pictures of the event with his cell phone and described the shooter's physical attributes, demeaner, and outfit with detail.

At approximately 11:15 a.m., Grand Rapids Police Department officers were dispatched to the intersection of Prospect and Cherry for a call of shots fired. Responding officers located the victim, who was still breathing, and seven casings in the surrounding area. Officers were provided with still images and a description of the vehicle involved in the incident; that vehicle was observed elsewhere in Grand Rapids less than two hours later. When officers attempted to effectuate a traffic stop, the vehicle fled at a high rate of speed, eventually crashing into a police cruiser. Defendant was driving the suspect vehicle, and he was wearing the same clothing as the murder suspect when he was taken into custody. A loaded nine-millimeter pistol, digital scale, baggies with residue, and five unfired .22 caliber cartridges were recovered from the vehicle. A pocketknife and a rock of crack cocaine were recovered from defendant's pockets.

At the September 2022 jury trial, defendant exercised his constitutional right to represent himself after the jury was selected. Defendant was convicted and sentenced as stated earlier. Defendant now appeals.

## II. REMAND FACTS

We previously remanded this case "for a competency evaluation, evidentiary hearing, and decision regarding whether defendant was competent to stand trial or waive his right to counsel." *People v Stewart*, unpublished order of the Court of Appeals, entered March 13, 2025 (Docket No. 367256), p 1. On remand, the trial court referred defendant for a competency evaluation and conducted an evidentiary hearing, ultimately concluding that "[d]efendant was competent to stand trial and to waive his right to counsel."

At the evidentiary hearing, the reports of Dr. Thomas D. Shazer and Dr. Jarrad Morgan were admitted by stipulation, and the trial court heard testimony from Dr. Shazer, Dr. Morgan, and defendant's standby trial counsel, Michael Liquigli.

In October 2023, Dr. Shazer conducted a retrospective competency evaluation of defendant, which consisted of an hour and 40 minute interview with defendant, a telephone interview with defendant's aunt, and review of defendant's: (1) school records, (2) mental health records, (3) Michigan Department of Corrections [MDOC] records, (4) court transcripts, and (5) court filings. Dr. Shazer's report, seemingly contradictorily, indicated that defendant "was apparently functioning roughly within the normal range of intellectual ability" during his interview but that defendant was "apparently psychotic, suffering from delusions and likely from

hallucinations, at that time."[2]  Dr. Shazer explained that trial transcripts and legal documents written by defendant appeared to show that defendant "was suffering from delusions and verbal disorganization beginning by at least the spring of 2022, and that he continued to exhibit verbal disorganization at the time of his trial in September of that year."  As a result, Dr. Shazer concluded that defendant's "understanding of the nature and object of the proceedings against him was impaired," despite simultaneously asserting that defendant's "conversational speech was free from patently delusional content" and that defendant "demonstrated an understanding of various procedural protections afforded to criminal defendants."  Dr. Shazer also asserted that defendant had "a very basic level of understanding about what is involved in a plea bargain."

At the evidentiary hearing, Dr. Shazer was qualified as an expert in forensic psychology. Dr. Shazer testified that defendant was not competent to stand trial in 2022 and that defendant suffered from a psychotic disorder, likely schizophrenia.  Dr. Shazer drew attention to defendant's pretrial release order motion and closing argument at trial, stating that both were indicative of disorganized thought processes, which are a symptom of psychosis.  Defendant told Dr. Shazer that he fired Liquigli because he believed that Liquigli did not "give him discovery" and was in fact working for the prosecutor.  Dr. Shazer believed that defendant had a "formal thought disorder" that impaired his ability to communicate with his attorneys; accordingly, Dr. Shazer did not believe that defendant's waiver of his right to counsel was made knowingly and intelligently. Dr. Shazer specifically did not believe that the trial court's warnings to defendant—that representing himself was not in his best interest—were enough to ensure that defendant knowingly waived his right to counsel because: (1) the trial court's warnings could not mitigate defendant's delusional belief that he was being represented by attorneys who were working against him, and (2) defendant's disorganized thinking made it difficult for him to contemplate the trial court's warnings.

On cross-examination, Dr. Shazer conceded that defendant understood the charges against him; the acts that led to those charges; the roles of the participants in the legal proceedings; and the procedural protections in place, such as the right to confront witnesses, cross-examine witnesses, and testify.  Dr. Shazer acknowledged that defendant may have misused legal terms— relative to probate, antitrust, and corporation law in his writings to the trial court, but he stated that such misuse was simply indicative of defendant "being so disorganized that he can't communicate what it is that he is really trying to say."

In April 2025, Dr. Morgan conducted a retrospective competency evaluation of defendant, which consisted of an hour and 15 minute video interview with defendant[3] and review of the following: (1) Dr. Shazer's report, (2) court filings, (3) court transcripts, (4) Kent County Correctional facility records, (5) MDOC records, (6) defendant's school records, (7) defendant's mental health records, and (8) a 1997 Children's Protective Services report.  Dr. Morgan concluded

---

[2] Dr. Shazer concluded that defendant was hallucinating during the interview because defendant "smiled oddly, for no apparent reason" and "the scope of his concentration was limited."  At the evidentiary hearing, Dr. Shazer testified that defendant denied ever hallucinating.

[3] Dr. Morgan stated that "[a]lthough the [video] connection was not ideal and [defendant's] responses were infrequently inaudible, he readily repeated his responses when asked to do so."

that defendant "was able both to understand the nature and object of the proceedings against him and to assist in his defense in a rational manner at the time of [Dr. Morgan's] interview with him and during his trial in September 2022." Accordingly, Dr. Morgan stated that at the time of his evaluation, defendant "was competent to stand trial both currently and retrospectively." Regarding defendant's current competency, Dr. Morgan explained that after defendant was incarcerated, he began receiving psychiatric medication, and "he neither exhibited signs or symptoms of an acute disorder of thought or mood during his evaluation nor displayed any indication of intellectual or cognitive disability." And regarding defendant's retrospective competency, Dr. Morgan explained as follows:

> The available information suggested that [defendant] displayed possible psychotic symptoms in July 2022, when he had been on a hunger strike and struggling with sleep.[4] Specifically, it was noted that he was experiencing paranoid ideation. A July 27, 2022 psychiatric evaluation determined that this ideation was delusional in nature; [defendant] declined treatment. Although it may have been beneficial at that time to obtain a competency evaluation, the symptoms apparently resolved without treatment given that the records make no further mention of psychotic symptoms until he was in custody of MDOC. Even while in MDOC custody, no mention of possible psychotic symptoms was made until December 29, 2022, and the diagnosis of a psychotic disorder was not made until January 5, 2023, more than three months after his trial. This suggests that any psychotic symptoms that he was experiencing while in jail were more likely related to his poor sleep or nutrition around the time of his hunger strike. Importantly, he displayed no behavior in the jail suggesting psychosis during his trial. Additionally, during trial, a judge and lawyers who were familiar with competency to stand trial did not note symptoms or behaviors that raised suspicion of incompetence. Lastly, according to Dr. Shazer's report, [defendant's] aunt denied that he had displayed psychotic symptoms before prison and had not begun to display symptoms until after he was placed on haloperidol, a medication that can produce side effects that mimic negative symptoms of psychosis.

> * * *

> Regarding [defendant's] understanding of the nature and object of proceedings against him, pleadings and court transcripts reveal his awareness of the adversarial nature of proceedings. He was repeatedly advised of the seriousness of his charges, and he acknowledged his understanding. Regarding his ability to assist in his defense in a rational manner, he displayed the ability to question witnesses, evaluate their responses, and produce follow-up questions. Additionally, he displayed the ability to consult with his standby counsel, most notably resulting in allowing counsel to participate in jury selection. He repeatedly advocated for himself and his position.

---

[4] Dr. Shazer testified that defendant sincerely believed that his food had been tampered with while in jail because the guards had cut his meat.

Although [defendant] was repeatedly advised that he was not performing well in defending himself, my understanding of the relevant statutory language is that a defendant needs only be capable of rationally assisting his attorney, not of representing himself, to be deemed competent. Court transcripts reveal that he was able to accept correction, ask clarifying questions, participate in cross-examination of witnesses, reframe questions, spontaneously change his approach when needed, seek to preserve issues for appeal, and identify inconsistencies in the evidence. Furthermore, during both this interview and according to the report of Dr. Shazer, [defendant] was able to provide the rationale for his strategic decisions, for example, discharging his attorneys for not agreeing with how he preferred to defend his case. These activities reveal an absence of thought disorganization impacting his rationality. There was no clear evidence to support a finding of an active psychotic process or other mental condition interfering with his rationality during the trial.

At the evidentiary hearing, Dr. Morgan was qualified as an expert in forensic evaluations. Dr. Morgan testified that defendant currently and retrospectively understood the nature and object of the legal proceedings against him. Dr. Morgan explained that throughout the trial, defendant showed an understanding of what was happening and was involved in the adversarial process— namely defendant was able to question witnesses, find inconsistencies, ask appropriate follow-up questions, and consult with his standby attorney. Specifically, defendant's decisions to let standby counsel oversee jury selection and to not testify showed defendant's "capability of understanding the . . . nature and object of the proceedings against him."

Dr. Morgan acknowledged Dr. Shazer's belief that defendant's misuse of legal terms was indicative of disorganized thought; however, Dr. Morgan believed that defendant's misuse of legal terms simply "came across as a gentlemen [sic] with a 10th grade education attempting to understand complicated legal terminology . . . ." Dr. Morgan stated that defendant's mistrust of others—including his attorneys—was indicative of his diagnosis of "possibly having antisocial personality disorder," explaining that "it is a very common antisocial personality disorder to distrust other people and that is not psychotic in nature or delusional . . . ." Dr. Morgan asserted that just because someone appears delusional five months after a trial does not mean that they were also delusional at the time of trial.

Liquigli testified that since 1991, he had represented approximately 40 criminal defendants a year. He explained that he had requested competency evaluations for his clients in the past, but he did not see any reason to do so in this case because defendant "always asked [him] fairly intelligent questions . . . not law professor questions by any stretch of the imagination, but questions that a defendant in his position should be asking." Liquigli explained the charges against defendant "[m]any times," and defendant "always responded with appropriate follow-up questions . . . ." Liquigli stated that despite the trial court repeatedly telling defendant that representing himself was a bad idea, defendant was very adamant about representing himself.

In August 2022, there were two occasions when defendant refused to come to court. Liquigli testified that he did not find those occasions to be out of the ordinary because he had "had clients refuse to come over from the jail dozens of times. They are being difficult. They are being obstinate; they just don't want to come and face what they have to face."

Liquigli further testified that he had represented difficult clients in the past, and it was "very common" for him to represent someone who distrusts attorneys. He explained that he was often given the "most difficult clients" because he knew "how to represent them despite their throwing up road blocks." He had also dealt clients who believed there was more discovery to be had; he explained that if he determined that the desired information was "totally irrelevant," then he would treat it as such and "move on." Liquigli stated that despite defendant's concerns regarding discovery in this case, he had not withheld any discovery from defendant.

As previously stated, after reviewing witness testimony and reports, the trial court concluded that "[d]efendant was competent to stand trial and to waive his right to counsel." The trial court further concluded as follows:

> 1) Defendant did understand the nature and object of the proceedings against him during the pendency of his case and at trial; 2) Defendant did have the ability to assist in his defense in a rational manner and communicate with his trial attorneys during the pendency of his case and at trial; 3) Defendant did have the ability to make a knowing, intelligent, and voluntary waiver of his right to counsel; and 4) the decisions of Defendant's various trial attorneys to not request a competency evaluation were not ineffective.

## III. COMPETENCY TO STAND TRIAL

On appeal, defendant first argues that he was not competent to stand trial; therefore, (1) the trial court erred by failing to sua sponte order a competency evaluation of defendant, and (2) defendant's three trial attorneys were ineffective for failing to request a competency evaluation of defendant. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Because defendant raised these issues in his motion for a new trial, they are preserved for appellate review. See *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007); *People v Sabin (On Second Remand)*, 242 Mich App 656, 658; 620 NW2d 19 (2000).

A trial court's decision regarding whether facts brought to its attention gave rise to a "bona fide doubt" about a defendant's competence and, therefore, imposed a duty on the court to raise the issue of incompetence, is reviewed for an abuse of discretion. *People v Kammeraad*, 307 Mich App 98, 138; 858 NW2d 490 (2014) (quotation marks and citation omitted). A court's determination whether a defendant is competent to stand trial is also reviewed for an abuse of discretion. *Id*.

Whether defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). A trial court's findings of fact, if any, are reviewed for clear error, and questions of constitutional law are reviewed de novo. *Id*.

## B. COMPETENCY GENERALLY

A defendant has a due-process right not to be tried or convicted while incompetent to stand trial, *Kammeraad*, 307 Mich App at 137, but "[a] defendant to a criminal charge shall be presumed competent to stand trial," MCL 330.2020(1). Under Michigan law, a defendant "shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner." MCL 330.2020(1). "The [trial] court shall determine the capacity of a defendant to assist in his defense by his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial." MCL 330.2020(1).

Based "[o]n a showing that the defendant may be incompetent to stand trial, the court must order the defendant to undergo an examination by a certified or licensed examiner of the center for forensic psychiatry or other facility officially certified by the department of mental health to perform examinations relating to the issue of competence to stand trial." MCR 6.125(C)(1). See also MCL 330.2026(1). A trial court does not abuse its discretion by failing to order a competency examination whenever "[a] reasonable judge . . . could logically have rejected the proposition that defendant was 'incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner.' " *Kammeraad*, 307 Mich App at 140, quoting MCL 330.2020(1). But when there is "at least a bona fide doubt as to whether defendant was competent to stand trial[,] . . . it [is] error for the trial court to fail to have defendant's competence reevaluated prior to trial." *People v Harris*, 185 Mich App 100, 103; 460 NW2d 239 (1990). "Evidence of a defendant's irrational behavior, a defendant's demeanor, and a defendant's prior medical record relative to competence are all relevant in determining whether further inquiry in regard to competency is required." *Kammeraad*, 307 Mich App at 139. Because the trial court is "able to personally observe defendant's behavior and conduct, hear live [the] defendant's remarks and the tone of and inflections in his voice, and directly assess [the] defendant's demeanor, attitude, and comments, . . . we generally defer to the court's findings on such matters." *Id*. at 141.

## C. THE TRIAL COURT'S FAILURE TO SUA SPONTE ORDER A COMPETENCY EVALUATION

Throughout the proceedings in the trial court, including periods during which defendant was represented by counsel, defendant filed voluminous handwritten requests, correspondence, motions, and other writings. Defendant cites these filings as evidence of his delusions and incompetence; however, after reviewing defendant's *in propria persona* filings, we are left with the conclusion that, although defendant was seriously mistaken about numerous legal concepts, those filings do not evidence delusions or incompetence. Defendant's filings were properly formatted and cited legal authority, albeit legal authority that largely did not apply to his proceedings. Defendant repeatedly asserted that he was not provided with discovery in violation of *Brady*[5] and objected to making a decision regarding his plea offer without the benefit of reviewing all the discovery. Defendant also repeatedly asserted that his attorneys were ineffective for failing to sufficiently communicate with him, provide him with discovery, or advocate

---

[5] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

strenuously on his behalf, and he accused his attorneys of "forming a corporation" with the prosecuting attorney and trial court, when clearly defendant was objecting to what he perceived was "cooperation." Defendant apparently lost trust in his defense counsel and cited antitrust principles in numerous filings, not appreciating the inapplicability. As previously sated, Dr. Morgan acknowledged Dr. Shazer's belief that defendant's misuse of legal terms was indicative of disorganized thought; however, Dr. Morgan believed that defendant's misuse of legal terms simply "came across as a gentlemen [sic] with a 10th grade education attempting to understand complicated legal terminology . . . ." Although defendant's grasp of the law and legal proceedings was plainly not proficient, the record also plainly displays that defendant appreciated the gravity of his circumstances, understood the proceedings, and understood the consequences.

The test as to whether a bona fide doubt exists regarding a defendant's competence is "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Id*. at 138-139 (quotation marks and citation omitted). As stated earlier, "[e]vidence of a defendant's irrational behavior, a defendant's demeanor, and a defendant's prior medical record relative to competence are all relevant in determining whether further inquiry in regard to competency is required." *Id*. at 139.

> There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts. [*Drope v Missouri*, 420 US 162, 180; 95 S Ct 896; 43 L Ed 2d 103 (1975).]

This is a case in which trained professionals—Dr. Shazer being a forensic psychologist and Dr. Morgan being a forensic psychiatrist—offered varying opinions on the same facts. As previously stated, we give deference to the trial court's ability to see the defendant's behavior, language, tone, and inflections and then assess the defendant's demeanor, comments, and attitude. *Kammeraad*, 307 Mich App at 141. At the hearing on defendant's motion for a new trial, the trial court specifically noted that: (1) if it believed that defendant's competence was in doubt, then it would have sua sponte ordered a competency evaluation; and (2) during its 18 years on the bench, it had never denied a defendant's request for a competency evaluation. On remand, the trial court extensively considered the procedural facts of this case, the prior court's analysis and reasoning in letting defendant represent himself, and Dr. Shazer's and Dr. Morgan's opposing reports. Even considering the forensic experts' disagreement, the trial court determined that defendant failed to overcome the presumption that he was competent to stand trial. The trial court determined that:

> 1) Defendant did understand the nature and object of the proceedings against him during the pendency of his case and at trial; 2) Defendant did have the ability to assist in his defense in a rational manner and communicate with his trial attorneys during the pendency of his case and at trial; 3) Defendant did have the ability to make a knowing, intelligent, and voluntary waiver of his right to counsel; and 4) the decisions of Defendant's various trial attorneys to not request a competency evaluation were not ineffective.

Given Dr. Shazer's contradictory report, and our review of the record in this matter, we are also not persuaded that a bona fide doubt was established sufficient to question defendant's competency at the time of trial.

Therefore, the trial court did not abuse its discretion by failing to sua sponte order a competency evaluation or by determining that defendant was competent to stand trial.

## D. INEFFECTIVE ASSISTANCE OF COUNSEL

"Criminal defendants are entitled to the assistance of counsel under both the Michigan and United States Constitutions. Const 1963, art 1, § 20; US Const, Am VI. This right guarantees the effective assistance of counsel." *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023), citing *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

> To prevail on a claim of ineffective assistance of counsel, a defendant bears a heavy burden to establish that (1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness, and (2) but for counsel's error, there is a reasonable probability that the outcome of the defendant's trial would have been different. [*People v Solloway*, 316 Mich App 174, 188; 891 NW2d 255 (2016).]

" 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015), quoting *Strickland*, 466 US at 694.

Counsel's performance should be evaluated without the benefit of hindsight, and "[a] defendant must overcome a strong presumption that counsel's actions constituted sound trial strategy." *Solloway*, 316 Mich App at 188. "Generally, attorneys are given broad latitude to determine trial strategy, and there is a strong presumption that counsel's performance was born from sound strategy. However, counsel's strategic decisions must be objectively reasonable." *Yeager*, 511 Mich at 488 (citation omitted).

Because defendant has failed to make a bona fide showing that he was incompetent at the time of trial, defendant necessarily cannot establish that his assorted defense counsel were ineffective for failing to request a competency evaluation.

## IV. WAIVER OF RIGHT TO COUNSEL

Defendant further argues that: (1) the trial court erred by failing to inquire into defendant's competence when evaluating defendant's waiver of his right to counsel, and (2) defendant did not display a clear understanding of his waiver during his colloquy with the trial court. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Because defendant raised these issues in his motion for a new trial, they are preserved for appellate review. See *Metamora Water Serv*, 276 Mich App at 382. A trial court's findings regarding whether a defendant's waiver of counsel was knowing and intelligent is reviewed for clear error, but the meaning of "knowing and intelligent waiver" is a question of law reviewed de novo. *People v Williams*, 470 Mich 634, 640; 683 NW2d 597 (2004). "Clear error occurs if

the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018) (quotation marks and citation omitted). "Credibility is crucial in determining a defendant's level of comprehension, and the trial judge is in the best position to make this assessment." *Williams*, 470 Mich at 640 (quotation marks and citation omitted).

## A. ANALYSIS

In *People v Russell*, 471 Mich 182, 190-191; 684 NW2d 745 (2004), our Supreme Court summarized the established requirements necessary to effectuate a valid waiver and permit a defendant to represent himself as follows:

Upon a defendant's initial request to proceed pro se, a court must determine that (1) the defendant's request is unequivocal, (2) the defendant is asserting his right knowingly, intelligently, and voluntarily through a colloquy advising the defendant of the dangers and disadvantages of self-representation, and (3) the defendant's self-representation will not disrupt, unduly inconvenience, and burden the court and the administration of the court's business.

In addition, a trial court must satisfy the requirements of MCR 6.005(D), which provides in pertinent part as follows:

The court may not permit the defendant to make an initial waiver of the right to be represented by a lawyer without first

(1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation, and

(2) offering the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer.

The trial court must substantially comply with these requirements, "in a short colloquy with the defendant," and the substantial compliance requirement is "nonformalistic" in nature. *Id*. at 191 (quotation marks and citation omitted).

As previously stated, the trial court did not abuse its discretion by determining that defendant was competent to stand trial. The record reflects that, on numerous occasions, both pretrial and throughout each day of the trial in this matter, the trial court repeatedly warned defendant of the dangers of self-representation; inquired whether that was nonetheless defendant's desire; admonished him that disruptions to court proceedings would not be tolerated; and reiterated that defendant would be held to the same standards as an attorney, even going so far as to quiz defendant regarding assorted aspects of trial procedure and the rules of evidence. Each time, defendant definitively expressed his desire to represent himself, even in the face of the trial court informing defendant—out of the presence of the jury—of what a poor job he was doing. Further, the trial court complied with MCR 6.005(D) and had defense counsel remain as standby counsel.

-10-

Defendant made an unequivocal, knowing, intelligent, and voluntary waiver of his right to counsel and instead decided to represent himself. The trial court did not err in this regard.

## V. JOINDER OF DEFENDANT'S CASES

Defendant further argues that the trial court erred by joining his two cases for the purpose of trial, asserting that the two incidents were not related and incorrectly claiming that the events occurred two days apart. We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

Defendant preserved this issue by objecting to the prosecution's motion to join his two cases. See *Metamora Water Serv*, 276 Mich App at 382. When evaluating whether joinder of two cases is permissible, the "trial court must first find the relevant facts and then must decide whether those facts constitute 'related' offenses for which joinder is appropriate." *People v Williams*, 483 Mich 226, 231; 769 NW2d 605 (2009). This inquiry involves "a mixed question of fact and law" and, therefore, "is subject to both a clear error and a de novo standard of review." *Id*. But "the ultimate decision on permissive joinder of related charges lies firmly within the discretion of trial courts." *People v Gaines*, 306 Mich App 289, 304; 856 NW2d 222 (2014) (quotation marks and citation omitted).

### B. ANALYSIS

Regarding joinder of cases when there is a single defendant, MCR 6.120 states, in pertinent part, as follows:

(B) Postcharging Permissive Joinder or Severance. On its own initiative, the motion of a party, or the stipulation of all parties, except as provided in subrule (C), the court may join offenses charged in two or more informations or indictments against a single defendant . . . when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense.

(1) Joinder is appropriate if the offenses are related. For purposes of this rule, offenses are related if they are based on

(a) the same conduct or transaction, or

(b) a series of connected acts, or

(c) a series of acts constituting parts of a single scheme or plan.

(2) Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial.

In *People v Abraham*, 256 Mich App 265, 272; 662 NW2d 836 (2003), this Court determined that joinder was appropriate "because the shootings occurred within a couple of hours of each other in the same neighborhood, with the same weapon, and were part of a set of events interspersed with target shooting at various outdoor objects." This Court also noted that "the same witnesses testified to a single state of mind applicable to both offenses." *Id*.

In this case, defendant was identified and arrested two hours after he murdered the victim. He was operating the same vehicle that was seen at the shooting, he was wearing the same distinctive clothing as the shooter, and a handgun was recovered from his vehicle. Should separate trials have been held, the same witnesses that were present at defendant's arrest would have been required to testify at both defendant's murder trial and his drug-and-weapon possession trial. See *id*; see also MCR 6.120(B)(2). Accordingly, the events constituted a series of connected acts, and joinder did not result in confusion or prejudice. See *Abraham*, 256 Mich App at 272; MCR 6.120(B)(1) and (2). Furthermore, not joining defendant's cases for trial would have amounted to a drain on the parties' and the court's resources. See MCR 6.120(B)(2). Additionally, evidence in each case was relevant in the other to prove defendant's identity as the shooter, considering the evidence of the vehicle used as well as his distinctive clothing. See MRE 404(b)(2). "[W]hen the joined counts are logically related, and there is a large area of overlapping proof, joinder is appropriate." *Williams*, 483 Mich at 237 (quotation marks and citation omitted). Therefore, the trial court did not err by determining that joinder was appropriate in this case.

We affirm.

/s/ Mark T. Boonstra
/s/ Kathleen A. Feeney

Hood, P.J. did not participate.